UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.08-80507-Civ-Hurley/Hopkins

AMERICAN PERSONALITY PHOTOS, LLC,

       Plaintiff,

vs.

JOHN Y. MASON,

       Defendant.
_____/

## REPORT AND RECOMMENDATION AS TO DEFENDANT'S MOTION TO DISMISS COMPLAINT AND COMPEL ARBITRATION (DE 17)

**THIS CAUSE** is before the Court upon an Order Referring Defendant's Motion to Dismiss Complaint and Compel Arbitration for a Report and Recommendation. (DEs 17, 22). This Court has before it Defendant's Motion, Plaintiff's response in opposition, and Defendant's Reply, as well as several affidavits relied upon by the parties. (DE 17, 18, 19, 20, 23, 24, 25, 28). For the reasons that follow, this Court **RECOMMENDS** that the District Court **DENY** Defendant's Motion. (DE 17).

### BACKGROUND

The instant dispute has its roots in the remediation of a Boca Raton building formerly owned by American Media Inc. (the "AMI building"). (DE 1, pg. 2). After the terrorist attacks of September 11, 2001, letters containing anthrax were sent to the AMI building. (DE 1, pg. 2). The Palm Beach County Health Department closed and quarantined the building and its contents on October 10, 2001. (DE 1, pg. 2).

Two years later, in April of 2003, an affiliate of Plaintiff American Personality Photos,

LLC ("APP"), known as Broken Sound, LLC ("Broken Sound") acquired the AMI building and all contents which had not yet been destroyed. (DE 1, pg. 2 and exh. 2). In December of 2003, Broken Sound and another entity known as Sabre Technical Services, LLC ("Sabre") entered into an agreement for remediation of the building. (DE 2, pg. 3; DE 7, pg. 2 and exh. A).

The Remediation Services Agreement, which contained an arbitration clause, was executed by David Rustine ("Rustine"), as President of Broken Sound, and John Y. Mason ("Mason") as President of Sabre. (DE 7, exh. A, pg. 24). The agreement designated Mason as an authorized representative of Sabre for purposes of communications between Sabre and Broken Sound. (DE 7, exh. A, ¶ 2.7). However, nothing in the agreement indicates that the agreement was undertaken for the benefit of any entities or individuals apart from Broken Sound and Sabre. (DE 7, exh. A).

In February of 2004, during the remediation, Sabre employees found a valuable photograph taken of Elvis while he was in his coffin. (DE 1, pg. 3; DE 7, exh. C). Although APP maintains that Mason threatened to "lose" the photo if Broken Sound did not agree to extend the deadline for completing the remediation, Mason contends that the photo was destroyed, pursuant to the terms of the Remediation Services Agreement, along with various other items that remained in the building after the quarantine was imposed. (DE 1, pg. 3; DE 7, pg. 9). The parties' dispute over the whereabouts of the photo was not resolved amicably.

Although it was amended several times, the remediation agreement terminated in May of 2005. (DE 1, pg. 4; DE 7, pg. 10). Sabre vacated the premises and provided the keys to the county Health Department. (DE 1, pg. 4).

Approximately 8 months later, on January 10, 2006, Broken Sound and APP executed a

2

Bill of Sale and Assignment, pursuant to which APP acquired an interest in all the photographs and documents which were contained within the AMI building at the time the site was exposed to anthrax in 2001. (DE 1, exh. 3). The Bill of Sale and Assignment also included a clause which provided that as a result of the sale, Broken Sound appointed APP the "true and lawful attorney-in fact" of Broken Sound, with the following rights:

> . . . with full power of substitution, having full right and authority in the name of the Seller to collect or enforce for [Broken Sound's] account any liabilities or obligations of third parties in respect of the assets; to institute and prosecute all proceedings that [Broken Sound] may deem proper in order to collect, assert, or enforce any claim, right, or title of any kind on or to the Assets; and to do all such acts and things in relation to the Assets[1] that [Plaintiff] may deem advisable.

(DE 7, exh. 3).

After the quarantine was lifted in February of 2006, Broken Sound and APP were permitted to enter the building for the first time since the quarantine had been imposed, and discovered that the Elvis photo was missing. (DE 1, pg. 4). In the first months of 2007, Sabre and Broken Sound began discussing issues surrounding Sabre's incomplete remediation of the building and the missing photograph. (DE 7, pgs. 11-12 and exh. J). In May of 2007, Sabre filed a demand for arbitration, and Sabre and Broken Sound have been in arbitration since that time. (DE 7, pg. 12).

In May of 2008, APP commenced this action against Mason, asserting causes of action for replevin and conversion. (DE 1, pgs. 4-6). In response, Mason filed counterclaims against Broken Sound and Rustine, as well as a demand for arbitration with APP, Broken Sound, and Rustine. (DE 7, pgs. 1-16). Mason also filed a separate Motion to Dismiss Complaint and

---

[1] Pursuant to the Bill of Sale and Assignment, the "assets" are defined as the personal property which was contained in the building at the time of the sale.

3

Compel Arbitration, which has been referred to this Court. (DE 17).

## DISCUSSION

In his motion, Mason argues that APP's complaint should be dismissed or stayed, and that APP should be compelled to arbitrate its dispute with Mason in the arbitration that is currently pending before the American Arbitration Association, styled *Sabre Technical Services, LLC v. 5401 Broken Sound, LLC*, AAA Case No. 13 192 Y 01095 07. (DE 17, pg. 10). Mason contends that APP can be compelled to arbitrate because the dispute is subject to the mandatory arbitration agreement between Sabre and Broken Sound, as provided for in the Remediation Services Agreement. (DE 17, pg. 12). Mason further asserts that the dispute between APP and Mason is subject to the arbitration agreement between Broken Sound and Sabre because the dispute arises out of and relates to the Remediation Services Agreement. (DE 17, pgs. 13-14). Mason relies on several theories to compel APP into arbitration: (1) APP, a non-signatory of the arbitration agreement, is an employee or agent of the signatory, Broken Sound; (2) a "close relationship" exists between APP and Broken Sound; and, (3) APP should be equitably estopped from avoiding arbitration. (DE 17, pgs. 15-18).[2]

In response, APP argues that it cannot be compelled into arbitration because (1) neither Mason nor APP are signatories to the arbitration agreement; (2) even if Mason and APP were parties to the arbitration clause in the agreement between Broken Sound and Sabre, the Remediation Services Agreement terminated on May 31, 2005; and, (3) even if the agreement did

---

[2] Mason also argues that arbitration should be compelled because APP has defaulted as to Mason's counterclaim for arbitration by failing to serve a responsive pleading. (DE 17, pgs. 10-11). As such, Mason requests the Court to grant Mason judgment against APP on Mason's counterclaim. (DE 17, pgs. 11-12). However, in light of the dispositive nature of such a request, and because a ruling on such request is not necessary to decide the narrow issue of whether arbitration should be compelled, this Court will not address such issue.

4

not expire, the instant dispute does not fall into the scope of the arbitration clause. (DE 25, pg. 2).

The Supreme Court has long recognized and enforced a liberal policy in favor of arbitration. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 82 (2002). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *Howsam*, 537 U.S. at 82 (*quoting Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). *See also Scott v. Prudential Secs., Inc.*, 141 F.3d 1007, 1011 (11th Cir. 1998) (observing that because arbitration is a creature of contract, no party can be compelled to submit to arbitration without having given prior contractual consent to do so) (*citing AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)). Arbitrators derive their authority to resolve disputes only as a result of the parties' agreement to submit the dispute to arbitration. *See AT & T Techs., Inc.*, 475 U.S. at 649. Because parties can only be forced to arbitrate issues where they have specifically agreed to arbitrate, courts hesitate to interpret silence or ambiguity in favor of arbitration out of fear that to do so might force parties to arbitrate an issue they would reasonably have thought a judge, not an arbitrator, would decide. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (*citing Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219-220 (1985) for the proposition that the basic purpose of the FAA is to ensure judicial enforcement of privately made agreements to arbitrate).

In determining whether the parties agreed to arbitrate a particular matter, courts are generally required to apply ordinary state law principles as to the formation of contracts. *See First Options*, 514 U.S. at 944. *See also Scott*, 141 F.3d at 1011 (*citing First Options*, 514 U.S. at 944); *Employers Ins. Of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th

5

Cir. 2001) ("Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements.") (*citing Perry v. Thomas*, 482 U.S. 483 (1987)).  In the instant case, the parties agree that because the remediation agreement specifies New York law, New York law should apply herein.  (DE 7, exh. A, pg. 21, art. 17; DE 25, pg. 8, n. 2; DE 28, pg. 7, n.7).

Like the federal common law, New York law also provides that parties cannot be forced to arbitrate in the absence of an agreement.  *See Mionis v. Bank Julius Baer & Co., Ltd.*, 749 N.Y.S.2d 497, 501 (N.Y. App. Div. 2002) (*citations omitted*).  "An agreement to arbitrate requires a clear and unequivocal manifestation of an intention to arbitrate because it involves the 'surrender [of] the right to resort to the courts.'"  *Mionis*, 749 N.Y.S.2d at 501-502 (*quotation omitted*).

**Compelling Non-signatories to Arbitrate**

Absent an express agreement to arbitrate, non-signatories can only be compelled to arbitrate a dispute in five limited circumstances: (1) incorporation by reference, (2) assumption; (3) agency; (4) veil piercing/alter ego; and, (5) equitable estoppel.  *See Denney v. BPO Seidman, LLP*, 412 F.3d 58, 71 (2d Cir. 2005) (*quoting Thomson-CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995)); *Merrill Lynch Invs. Mgrs. v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (*quoting Thompson-CSF, S.A.*, 64 F.3d at 776)); *GFI Sec. LLC v. Tradition Asiel Sec. Inc.*, No. 601183/08, 2008 WL 4559921, *13 (N.Y. Sup. Ct. July 28, 2008).

"[I]t matters whether the party resisting arbitration is a signatory or not."  *Optibase, Ltd.*, 337 F.3d at 131) (*citing Thomson-CSF*, 64 F.3d at 779).  "[A] court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party . . ."  *Optibase, Ltd.*, 337 F.3d at

131 (*quoting Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999)). Compelling a non-signatory to arbitration requires "careful consideration." *Choctaw*, 271 F.3d at 406.

A willing signatory seeking to compel a non-willing non-signatory into arbitration must establish at least one of the theories listed in *Thomson-CSF*, 64 F.3d at 776-780. *See Optibase, Ltd.*, 337 F.3d at 131. However, where a non-signatory seeks to invoke an arbitration clause, the five theories are not available. *See Choctaw Generation Ltd. P'ship v. American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001) (noting that none of the five theories were applicable because the non-signatory sought to invoke the arbitration clause). *See also Rosenbach v. Diversified Group, Inc.*, 833 N.Y.S.2d 78, 78-79 (N.Y. App. Div. 2007) (denying motion to compel arbitration because, *inter alia*, the movant was a non-signatory to the arbitration agreement).

This Court has found no cases where one non-signatory has compelled another non-signatory to arbitrate a dispute, nor has Mason provided any.

Because both Mason, in his individual capacity, and APP are both non-signatories, Mason's motion to compel arbitration has little merit based upon the above authorities. However, even if the foregoing were not enough, a brief discussion of the theories of agency and estoppel illustrates why, even if Mason or APP were signatories, Mason's motion should still be denied.

**Agency**

"Traditional principles of agency law may bind a non-signatory to an arbitration agreement." *Thomson-CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d at 777 (*citations*

*omitted*). "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Optibase, Ltd.*, 337 F.3d at 130 (*citation omitted*).

In New York, it is a well settled principle of agency law that "an agent who signs a contract on behalf of a known principal cannot be held to have made a commitment in his or her individual capacity." *See Mionis*, 749 N.Y.S.2d at 502 (*citation omitted*). This principle has been repeatedly upheld in the arbitration context. *See Id*. (*citations omitted*). However, where the alleged misconduct of the agent relates to the agent's behavior as an officer or director or the agent's capacity as agent of the corporation, courts permit the agent to benefit from arbitration agreements entered into by his or her principals. *See Nardi v. Povich*, 824 N.Y.S.2d 764, 2006 WL 2127714, *4 (N.Y. Sup. Ct. July 31, 2006) (*quoting Hirschfeld Prods., Inc. v. Mirvish*, 673 N.E.2d 1232, 1233 (N.Y. 1996) ("Federal courts have consistently afforded agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation.") The purpose of such rule is "not only to prevent circumvention of arbitration agreements but also to effectuate the intent of the signatory parties to protect individuals acting on behalf of the principal in furtherance of the agreement." *Hirschfeld Prods., Inc.*, 673 N.E.2d at 1233.

Mason argues that APP is the agent of Broken Sound, and that APP and Broken Sound have a "close relationship" which requires the Court to compel arbitration between Mason and APP. (DE 17, pgs. 15-17). In support of its theory of agency premised on a close relationship, Mason relies on the Bill of Sale and Assignment executed by Broken Sound and APP, and

alleges that Broken Sound and APP are under common control, utilize the same counsel, and have commingled their putative interests in their dealings with Sabre and Mason. (DE 17, pg. 17).

APP, Broken Sound, and Rustine refute Mason's contentions of a close relationship and agency. In support of their position, APP and Broken Sound rely on an affidavit prepared by Rustine which shows that APP and Broken Sound have (1) different owners; (2) different officers; (3) independent and separate bank accounts; (4) independent and separate stationary; (5) independent and separate assets; and, (6) independent and separate business purposes. (DE 25, pg. 3; DE 24). APP and Broken Sound also note that (7) neither APP nor Broken Sound have ever been used or disclosed as an agent for the other; (8) the sale of the photographs from Broken Sound to APP was a bona fide sale for valuable consideration; and, (9) although the Bill of Sale and Assignment contains language which states that Broken Sound appointed APP the "true and lawful attorney-in fact" of Broken Sound, Broken Sound did not intend to appoint APP as its agent. (DE 24, pg. 5; DE 25, pgs. 3-4). Rather, such language was merely intended to ensure that APP could pursue claims on its own behalf against third parties in connection with the assets being purchased by APP. (DE 24, pg. 5; DE 25, pgs. 3-4).

In *Optibase, Ltd.*, 337 F.3d at 130-131, the Second Circuit rejected an argument which is strikingly similar to that of Mason; namely, agency based on a close relationship. In *Optibase, Ltd.*, 337 F.3d at 130, Optibase and Merrill Lynch Pierce, Fenner & Smith, Inc. executed an arbitration agreement. Optibase, as a signatory to the arbitration agreement, sought to compel arbitration with the plaintiff, Merrill Lynch Investment Managers, a non-signatory and sister company to Merrill Lynch Pierce, Fenner & Smith, Inc. *Optibase, Ltd.*, 337 F.3d at 127.

9

In support of its contention that the non-signatory should be compelled into arbitration, Optibase relied on an agency theory which was based on the affiliate relationship and various corporate relationships between Merrill Lynch Investment Managers and Merrill Lynch Pierce, Fenner & Smith, and Merill Lynch & Company.  *Optibase, Ltd.*, 337 F.3d at 130.  However, the Second Circuit noted that in *Thomson-CSF*, "similar considerations-mutual benefits derived from affiliation-were rejected as insufficient to bind a non-signatory on agency principles to an arbitration agreement signed by an affiliate."  *Id*. at 130 (noting that the District Court had improperly relied upon factors such as common ownership, corporate control, actual notice of the arbitration agreement, and intent to bind the non-signatory to the arbitration agreement).

In addition to the fact that the Second Circuit has rejected Mason's argument of agency premised on a close corporate relationship, the record also shows that Mason signed the Remediation Services agreement as President of Sabre, not his individual capacity.  (DE 7, exh. A, pg. 24).  As such, Mason "cannot be held to have made a commitment in his individual capacity."  *Mionis*, 749 N.Y.S.2d at 502.

Moreover, nothing in the Remediation Services Agreement provides that the agreement was undertaken for the benefit of any entities or individuals, including the signing individuals, apart from Broken Sound or Sabre.  (DE 7, exh. A).  As such, Mason's claim that APP is bound to arbitrate the dispute is not persuasive.  *See Greater New York Mutual Ins. Co. v. Rankin*, 748 N.Y.S.2d 381, 382 (N.Y. App. Div. 2002) (affirming order which denied motion to compel filed by non-signatory because nothing in the arbitration clause suggested that the sublease signatories intended to confer on the non-signatory movant the right to compel arbitration of disputes arising under the sublease; stating, "Under New York law, the right to compel arbitration does not

extend to a party that has not signed the agreement pursuant to which arbitration is sought unless the right of the nonsignatory is expressly provided for in the agreement.") (*citations omitted*).

Finally, the fact that the remediation agreement executed by Broken Sound and Sabre was entered into and terminated approximately eight months before APP acquired rights to the photos from Broken Sound belies Mason's claim of agency. *See Thomson-CSF, S.A.*, 64 F.3d at 777 (noting that because the working agreement was entered into well before Thomson purchased Rediffusion, Thomson could not possibly be bound under an agency theory).

**Estoppel**

Mason also argues that APP should be compelled to arbitrate because APP has attempted to obtain the benefit of Sabre's performance under the remediation agreement while avoiding the obligation to arbitrate the dispute. (DE 17, pg. 18) (*citations omitted*).

In *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993), a foreign accounting firm received a settlement agreement concerning the use of a certain trade name in association with accounting practices. *See Thomson-CSF*, 64 F.3d at 778 (*citing Deloitte Noraudit*, 9 F.3d at 1064). Pursuant to the agreement, which contained an arbitration clause, local affiliates of the foreign accounting firm were allowed to use the trade name in exchange for compliance with the terms of the agreement. *See Id*. (*citing Deloitte Noraudit*, 9 F.3d at 1064). After a Norwegian firm received the agreement, the Norwegian began using the trade name, without lodging any objection to the terms of the agreement. *See Id*. The Second Circuit held that by "knowingly exploiting the agreement, the accounting firm was estopped from avoiding arbitration despite having never signed the agreement." *Id*. (*citing Deloitte Noraudit*, 9 F.3d at 1064).

11

Two years later, in *Thomson-CSF*, the Court again faced the issue of whether a non-signatory could be compelled into arbitration with a signatory. In *Thomson-CSF*, two corporations, E&S and Rediffusion Simulation Limited ("Rediffusion") entered into a Working Agreement, containing an arbitration clause, which required Rediffusion to purchase certain computer equipment exclusively from E&S. *See Id*. at 775. Subsequently, Thomson acquired Rediffusion. *See Id*. During the acquisition process, Thomson informed E&S that it did not consider itself bound by the agreement executed by Rediffusion. *See Id*. Ultimately, E&S filed suit claiming breach of the Working Agreement, and the District Court granted E&S's motion to compel arbitration based on Thomson's voluntary act of becoming an affiliate of Rediffusion, Thomson's level of control over Rediffusion, and the interrelatedness of the issues. *See Id*.

On appeal, the Second Circuit reversed, and held that the district court erroneously applied the estoppel theory to compel Thomson, a non-signatory, into arbitration because Thomson did not directly benefit from the agreement containing the arbitration clause. *See Thomson-CSF*, 64 F.3d at 778-779. In so doing, the Court emphasized that the only benefit obtained by Thomson was Thomson's corporate acquisition of Rediffusion, the other signatory of the agreement containing the arbitration clause. *See Id*. at 779. The Court noted that had Thomson directly benefitted from the Working Agreement by seeking to purchase equipment from E&S, or by enforcing the exclusivity provisions of the agreement, then Thomson would have been estopped from avoiding arbitration. *See Id*. However, because Thomson received no benefit from the Working Agreement itself, Thomson was not bound by its subsidiary's agreement to arbitrate under *Deloitte*. *See Id*.

Even if Mason were a signatory to the Remediation Services Agreement, Mason has not

shown how APP, a non-signatory, has directly benefitted in any way from the Remediation Services Agreement between Broken Sound and Sabre. Rather, pursuant to the Bill of Sale and Assignment, APP only acquired an interest in the photographs and documents contained within the AMI building. Therefore, based on *Thomson-CSF* and *Deloitte*, Mason's contention lacks merit.

As mentioned with regard to the agency theory, Mason argues that APP should be compelled to arbitrate the dispute because APP shares a close relationship with Broken Sound. (DE 17, pg. 17) (*citing Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993)). Whether the parties share a close relationship also comes to play under an alternative estoppel theory.

Under an alternative estoppel theory, recognized by both the Second and Eleventh Circuits, courts may require arbitration between a signatory and a non-signatory. *See Choctaw* (*citing Thomson-CSF*, 64 F.3d at 779). Courts consider "the relationships of the persons, wrongs and issues, in particular whether the claims that the non-signatory sought to arbitrate were 'intimately founded in and intertwined with the underlying contract obligations.'" *Choctaw*, 271 F.3d at 403 (*citing Sunkist Soft Drinks, Inc.,* 10 F.3d at 757). *See also Thomson-CSF*, 64 F.3d at 779 (noting that under an alternative estoppel theory, courts have been willing to estop a signatory from avoiding arbitration with a non-signatory when the issues that the non-signatory seeks to resolve are "intertwined with the agreement that the estopped party has signed.")

However, the mere fact that the parties may be related does not necessarily lead to a conclusion that arbitration should be compelled based on an alternative estoppel theory. *See Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008) (*citing JLM Indus.,*

*Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004); *Choctaw*, 271 F.3d at 406). Rather, in addition to "intertwined" factual issues, there must be the type of relationship which "justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings, Inc.*, 542 F.3d at 359. *See also World Bus. Ctr., Inc. v. Euro-American Lodging Corp.*, 764 N.Y.S.2d 27, 31 (N.Y. App. Div. 2003) (reversing order compelling non-signatory to arbitrate with signatory; stating, "[i]nterrelatedness, standing alone, is not enough to subject a non-signatory to arbitration.") (*citations omitted*).

Moreover, given the nature of arbitration, the distinction between whether a non-signatory seeks to compel a signatory into arbitration, and whether a signatory seeks to compel a non-signatory into arbitration, is important. *See Thomson-CSF*, 64 F.3d at 779. Because arbitration is a matter of contract, "if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so." *Id.* (*citing United Steelworkers of America*, 363 U.S. at 582).

In *Choctaw*, 271 F.3d at 406-407, the Second Circuit ultimately held that a non-signatory, American Home, could compel Choctaw, a signatory, into arbitration. In so doing, the Court reasoned that "the controversy between Choctaw [a signatory] and American Home [a non-signatory] could hardly be more closely bound to the dispute" which was already pending in arbitration. *See Choctaw*, 271 F.3d at 406. The Court noted that the surety contract, which did not contain the arbitration clause, incorporated by reference the underlying construction contract which did contain the arbitration clause. *See Id*. Moreover, the Court noted that the dispute between American Home and Choctaw concerned obligations under the construction contract.

14

*See Id*.

In the instant case, not only does Mason, a non-signatory, seek to compel another non-signatory into arbitration, but the dispute is not intertwined with the dispute which is already in arbitration between Broken Sound and Sabre. Rather, the instant dispute centers on APP's claim that Mason committed a tort in his personal capacity. The fact that this tort was allegedly committed during the time that Sabre was performing its duties under the contract does not negate the fact that nothing in the Remediation Services Agreement shows that Mason signed the agreement in his personal capacity, or that the agreement was executed for the benefit of Mason individually. *See Mionis*, 749 N.Y.S.2d at 502; *Rankin*, 748 N.Y.S.2d at 382. As such, it does not appear that APP can be bound by the arbitration clause contained in the Remediation Services Agreement executed by Broken Sound and Sabre.

*See also Rosenbach*, 833 N.Y.S.2d at 79 (holding that KPMG could not compel the plaintiffs into arbitration because KPMG was not a signatory to the arbitration provision; further stating that even if equitable estoppel were available in New York to enable non-signatories to compel signatories into arbitration, the dispute was not intertwined with the agreement which contained the arbitration provision).

Because Mason has failed to establish that APP should be compelled into arbitration under any of the five theories available in the absence of a written agreement, this Court **RECOMMENDS** that the District Court **DENY** Mason's Motion to Dismiss Complaint and Compel Arbitration. (DE 17).[3] *See Optibase, Ltd.*, 337 F.3d at 131-132.

---

[3] Because this Court has determined that arbitration cannot be compelled because neither Mason nor APP are signatories to the remediation agreement, APP's remaining contentions need not be addressed.

15

## RECOMMENDATION TO THE DISTRICT COURT

In conclusion, it is **HEREBY RECOMMENDED** that the District Court **DENY** Defendant's Motion to Dismiss Complaint and Compel Arbitration.  (DE 17).

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Daniel T. K. Hurley, United States District Court Judge for the Southern District of Florida, within ten (10) days of being served with a copy of this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Warren*, 687 F.2d 347, 348 (11th Cir. 1982), *cert. denied*, 460 U.S. 1087 (1983).  Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.  *See LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND SUBMITTED** in Chambers this 12 day of November, 2008, at West Palm Beach in the Southern District of Florida.

*/s/ James M. Hopkins*

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Hon. Daniel T. K. Hurley, United States District Court Judge for the Southern District of Florida
Counsel of Record